IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| HEATHER DEPUY, | |
| Plaintiff, | **8:14CV10** |
| vs. | |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security; | **MEMORANDUM AND ORDER** |
| Defendant. | |

Plaintiff Heather Depuy ("Depuy"), seeks review of a decision by the defendant denying her application for disability benefits under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 42 U.S.C. et seq.  After carefully reviewing the record, the court finds the case should be remanded.

## I.      PROCEDURAL BACKGROUND

Depuy applied for social security disability benefits on January 14, 2011, claiming an onset date of August 1, 2008.  (Social Security Transcript ("TR") at 243-44).  Her application was denied at the initial and reconsideration levels.  A hearing was held before an Administrative Law Judge ("ALJ") and on July 17, 2012, Depuy received a fully favorable decision awarding her benefits from the onset of disability – August 1, 2008. (TR. 111-112).  The Appeals Council gave notice of review of the decision and on December 11, 2012, issued an order of remand to the same AJL.  (TR 123-29).

The ALJ conducted a second hearing and on May 1, 2013, issued a decision finding Depuy was not entitled to a disability award.  Depuy appealed the decision and the Appeals Council denied the request for review on November 15, 2013.  In response, Depuy filed the action now before the court.

## II.     THE ALJ'S DECISION

The ALJ evaluated Depuy's claims through all five steps of the sequential analysis prescribed by 20 C.F.R. 404.1520 and 416.920.   (T.R. 14-28).   As reflected in her decision, the ALJ made the following findings:

1.     The claimant last met the insured status requirements of the Social Security Act on March 31, 2009.

2.     The claimant did not engage in substantial gainful activity during the period from her alleged onset date of August 1, 2008, through her last insured date of March 31, 2009 (20 CFR 404.1571 et seq.).

3.     Through the date last insured, the claimant had the following severe impairments: a history including a motor vehicle accident at age 17 and a fracture of the lumbar spine (20 CFR 404.1520(c)).

4.     Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.     After careful consideration of the entire record, through the date last insured, the claimant had the residual functional capacity to perform the full range of light work as defined in 20 CFR 404.1567(b).

6.     Through the date last insured, the claimant was capable of performing past relevant work as a receptionist, DOT 352.667-010, semi-skilled, light; general

office clerk, DOT 219.362-010, semi-skilled, light; and front desk clerk, DOT 238.367-038, semi-skilled, light.  This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.    The claimant was not under a disability, as defined in the Social Security Act, at any time from August 1, 2008, the alleged onset date, through March 31, 2009, the date last insured (20 CFR 404.1520(1)).

TR. 12-22.

## III.    ISSUES RAISED FOR JUDICIAL REVIEW

Depuy's complaint requests judicial review of the ALJ's decision.  She raises the following arguments in support of her claim for reversal.

1)    The ALJ gave improper weight to the opinion of the medical expert who testified at the hearing before the ALJ.

2)    The ALJ did not give proper consideration to Depuy's reported limitations in her daily activities.

3)    The ALJ failed to address the opinion of one of Depuy's treating physicians – Dr. Alan Williamson.

IV.    THE RECORD AND PROCEEDINGS BEFORE THE ALJ

In 1994, Depuy was involved in a car accident resulting in a sustained spinal cord injury and a fractured pelvis and hip.  As a result of the car accident, she underwent spinal and pelvic reconstructive surgery.  She returned to work at that time, but alleges her condition deteriorated over time and her increased pain level made it impossible for her to return to work fulltime by 2004.  At that time, her husband was on active duty in the United States Air Force and was stationed in Japan.  Depuy and their children lived in Japan with her husband.  In Japan, she received treatment for trochanteric bursitis and chronic low back pain.  (TR. 558-59).

Depuy underwent a physical therapy evaluation with Bradley Kime on September 22, 2004, due to her complaints of low back pain.  (TR. 558).  She described her pain as "constant dull pain localized at lumbar spine with intermittent sharp pain at sacrum . . . ." (TR. 558).  She further stated that bending aggravated her pain while sitting properly alleviated it.  (TR. 558).  Depuy reported her pain as 9 out of 10.  (TR. 558).  Kime implemented a treatment plan that involved pool exercises, a continued cardiovascular exercise program for 20 minutes a day, and a lumbar spine stabilization program.  (TR. 558).

During this time period, Depuy was also being treated for post-partum depression. (TR. 555).  She was taking anti-depression medication and, as part of her care plan, indicated she wanted to take time every day for exercise.  (TR. 555).

On September 26, 2006, Depuy sought treatment for her chronic pain from Dr. Wanker.  (TR. 519).  She reported pelvic and low back pain at 1 out of 10.  Yet, she also described her lower back pain as "chronic" and "unrelenting."  (TR. 519).  A motor examination revealed no dysfunction and she had normal flexion and extension of her

4

knees and ankles. (TR. 521). However, the lower back pain was "elicited by motion . . . [and] flexion. (TR. 521). Her "lumbosacral spine motion was normal." (TR. 521). Depuy complained of difficulty climbing stairs and a treating physician at that time noted that Depuy "would benefit from first floor housing . . . due to pain walking up stairs." (TR. 521).

On December 12, 2006, Depuy underwent an examination for overseas clearance. (TR. 501). She reported back pain, but the tests on her range of motion were normal. (TR. 502).

In March of 2007, the Depuys relocated to the Air Force Base in Spangdahalem, Germany. (TR 341). Depuy reported continuing problems with back and hip pain and was also treated for depression and anxiety. (TR. 471). Although she sought single-level housing at the base, the family was housed in a two-story residence. She reported that she fell almost daily going up or down the stairs due to her chronic pain. (TR. 342). On November 6, 2007, she was examined and given a steroid injection for bursitis in her hip.

Depuys' husband was reassigned to Offutt Air Force Base, and the family moved to Bellevue, Nebraska in May of 2008. (TR. 344). Depuy attempted to return to work in August of 2008, but after two weeks, she was unable to continue because her "headaches, hip, nerve and back pain became more than [she] could tolerate." (TR. 345). A left hip x-ray in October of 2009 revealed "chronic traumatic and postoperative changes" in her left hip. (TR. 669). That same day she received a steroid injection for her trochanteric bursitis. (TR. 458-60). The physician notes from that visit indicate x-rays of Depuy's pelvis and lateral left hip "demonstrates two level spinal fusion from L4 to S1 with degenerative changes [and] multiple healed pelvic fractures." (TR. 460).

The physician prescribed physical therapy for Depuy.  At the initial physical therapy evaluation, she reported difficulty with sitting, standing, walking, stairs, and lifting more than 20 pounds.  She also reported she had not been free of pain since the automobile accident in 1994.  (TR. 458).

Dr. Eric Grajkowski, one of Depuy's treating physicians at the time, wrote a statement, dated November 16, 2009, in support of the Depuy's request for single-level housing due to the "pain in [Depuy's] back and her lower extremities." (TR. 666).  In that same letter, he noted that her pain was chronic "though she does well with the help of orthopedic visits along with physical therapy."  (TR. 666).  At a physical therapy visit in December of 2009, she noted that her pain was a 0 out of 10 at that time, but earlier in the day when she was sitting in a car it was 7 or 8 out of 10. (TR. 441).

In March of 2010, Dr. Grajkowski opined that Depuy was "not a good candidate to work outside of the home" due to her chronic pain from the 1994 accident and because "any physical activity . . . will increase her pain level and her inability to function at these tasks."  (TR. 665).  In May of 2010, Depuy reported left hip pain, but normal movement of all her extremities.  (TR. 416-417).  In June of 2010, Depuy reported hip pain of 8 out of 10 if she sat in a chair with her hips flexed at a 90 degree angle for more than 5 minutes.  (TR. 413).   In November of 2010, her treating physicians completed the paperwork necessary for her to receive a permit allowing her to park in handicapped spaces, indicating she was unable to walk more than 200 feet without assistance.  (TR. 403 and TR. 350).

In 2011, Dr. Stephanie Erickson, Depuy's treating physician at the time, wrote a statement in support of Depuy's disability claim and opined "given [Depuy's] pain level and chronic problems related to mobility and function she is unable to work."  (TR. 389). Dr. Erickson opined in March of 2011, that Depuy could sit for only one hour out of an

eight hour day, and could occasionally lift up to, but never more than, five pounds.  (TR. 494).  Dr. Erickson further opined Depuy was unable to work two consecutive days and that her symptoms were severe enough to interfere with her attention, concentration, persistence, and pace, and that the limitations had been in effect since August 1, 2008. (TR. 494-95).

In April of 2011, Dr. Tyrus Soares, a pain specialist at the University of Nebraska Medical Center, met with Depuy.  Dr. Soares' notes indicate that he was reluctant to change her pain medication because she was "doing well on such a low dose." (TR. 600). During the visit, Depuy reported her level of pain was 3 out of 10 and that she was able to drive her children to school.  She also reported that some days her pain was so bad "her only relief [was] to lay in bed" about twice a week. (TR. 599).  On April 27, 2011, she saw Dr. Erickson for pain management but reported hip and lower back pain at 2 out of 10.

On June 7, 2011, Depuy visited Dr. Erickson for pain management.    Dr. Erickson's notes state:

> Doing well. Has now been to two pain consultations and (Dr. Cook and Dr. Soares) and they-are agreeable to our Percocet/vicodin/flexeril/NSAID plan with physical therapy, weight loss, and ambien for sleep.  Heather is happy with her pain level now and feels better.

(TR. 643).

However, in March of 2012, Depuy was still seeking treatment for her chronic back pain.  Dr. Erickson opined Depuy would benefit from a Transcutaneous Electrical Nerve Stimulation ("TENS") unit for her pain by noting Depuy's pain was "chronic and intractable."  (TR. 618).  Depuy apparently made this request because she "tried her

friends [TENS] unit that covered most of [Depuy's] lumbar region . . . she said it helped immensely."  (TR. 618).

On May 3, 2012 she again visited Dr. Erickson.  She reported her pain level was 2 out of 10.  Dr. Erickson noted:

> Pt continues to do well. She has joined Weight Watchers and has lost 13lbs. Her stress is better with her husband home, she is trying to exercise more. We recently renewed meds and she was just checking in. The chronic pain syndrome is related to an MVA in 1994 where she sustained a spinal cord injury and fractured pelvis and left hip.  She has been to therapy, she has been evaluated by both Dr. Cook and Dr. Soares.  She maintains a decent pain control with 30 of vicodin, 60 percocet a month and nighty ambien and flexeril.  She is able to care for her family and home.  She does not work outside the home.  She is currently pursing disability.

(TR. 611).

In May, Depuys exchanged the TENS unit for one that "stays in place better than the current [one] but the modality is good."  (TR. 613).  Dr. Erickson also noted that Depuy was using a "service dog that helps her balance and picks things off the floor.  She may need a medical necessity letter in the future."  (TR. 613).

Dr. Erickson completed two additional letters elaborating on her previous assessment of Depuy's limitations.  (TR. 354-55 & TR. 681).  Dr. Erickson stated that Depuy's pain has "waxed and waned" over the years and various treatments – including "hip injections, weight loss, physical therapy and medication management" – have provided "intermittent relief."  (TR. 681).  These opinions were based not only on Dr. Erickson's treatment notes, but also her review of Depuy's medical file since 2003.

Depuy's initial administrative hearing took place on June 18, 2012.  (TR. 39-72).  The ALJ questioned Depuy and a vocational expert.  On July 17, 2012, the ALJ issued a fully favorable decision.  (TR. 111-122).  On December 11, 2012, the Appeals Council remanded the ALJ's decision to obtain additional information and for further evaluation of the record.  (TR. 123-29).

In March of 2013, Depuy's new primary care doctor, Dr. Alan Williamson, provided a statement of Depuy's limitations, noting he agreed with Dr. Erickson's assessment and her previous statements regarding Depuy's functional limitations.  (TR. 682-83).

Depuy's second administrative hearing took place on April 23, 2013 (TR. 73-107).  Plaintiff testified that she had stress- and anxiety-related migraines that required hospitalizations.  (TR. 77-78).  She testified that she experienced constant pain in her lower back and pelvis from the onset date of August 1, 2008 through the last date of possible coverage of March 31, 2009.  (TR. 2009).  She further testified about the pain in her hips caused by chronic bursitis, and she reported that she is unable to get groceries, make dinner, or perform household chores. (TR. 82-83).  She stated that she would sit for 1 hour, stand or walk for an hour, and lay down for 6 hours daily.  (TR. 85-87).

Following instructions from the Appeals Council, the ALJ called a medical expert – Steven Goldstein, M.D. – to testify about Depuy's condition during the relevant period.  Dr. Goldstein indicated the evidence of record supported diagnoses of headaches and status post back surgery.  He testified that he did not find evidence of chronic pain during the relevant period.  (TR. 92-93).  And he further testified that the medical record demonstrated Depuy's range of motion in her hips was normal and that an injection helped alleviate her pain.  (TR. 97).  Finally, he opined that Depuy was capable of light work during the relevant period.

9

Vocational expert ("VE") Deborah Determan testified about Depuy's past relevant work as a cashier and performing clerical functions.  (TR. 101, 226-228).  The ALJ posed the following hypothetical to the VE:

> Then assume for purpose of the following hypothetical questions that the claimant is 31 years of age at onset, and has educational abilities, demands [consistent] with [a] 12th grade [education], and has done the past relevant work as a receptionist, a general office clerk, and a front desk clerk.  It is an individual who is involved in a motor vehicle accident at age 17, has history of fracture of the lumbar spine and the bilateral. Let's see. I can't read that. This is an individual who, based on the record as it is, from 8/1/08, to 3/31/09, does not have a formal diagnosis of migraines of headaches or traumatic arthritis or traumatic bursitis.  Simply status, post motor vehicle accident and fracture of the lumber spine.  This is an individual who can pick up 20 pounds occasionally, 10 pounds frequently, and sits down and walks six out of eight [hours].  Can this individual do her past relevant work?

(TR. 105).

The VE opined the hypothetical claimant described by the ALJ would be able to perform all of Depuy's past relevant work.  (TR. 105-06).  Depuy's attorney then asked the VE to consider Depuy's testimony and assume the claimant was experiencing migraines more than once a week, could only sit for 20 to 30 minutes at a time for a total of one hour a day, and stand and walk for about 5 minutes at a time for an hour out of each day.  (TR. 106).  Based on those restrictions, the VE opined that a person would be precluded from the past relevant work.  (TR. 107).

The ALJ issued her unfavorable decision on May 1, 2013 (TR. 9-27).  In reaching her decision, the ALJ gave significant weight to the testimony of the testifying medical expert in determining that the claimants' only severe impairment was her history of the lumbar spine fracture due to the 1994 motor vehicle accident.  The ALJ determined the

evidence of record was not sufficient to establish any other severe impairments, including migraine headaches or trochanteric bursitis.  (TR. 15).

## V.    LEGAL ANALYSIS

Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner under Title II, which in this case is the ALJ's decision.   A denial of benefits by the Commissioner is reviewed to determine whether the denial is supported by substantial evidence on the record as a whole.  Hogan v. Apfel, 239 F.3d 958, 960 (8th Cir. 2001) .

> If substantial evidence on the record as a whole supports the Commissioner's decision, it must be affirmed. Choate v. Barnhart, 457 F.3d 865, 869 (8th Cir. 2006). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" Smith v. Barnhart, 435 F.3d 926, 930 (8th Cir. 2006) (quoting Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)). "The ALJ is in the best position to gauge the credibility of testimony and is granted deference in that regard." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002).

Schultz v. Astrue, 479 F.3d 979, 982 (8th Cir. 2007). Evidence that both supports and detracts from the Commissioner's decision must be considered, but the decision may not be reversed merely because substantial evidence supports a contrary outcome. Wildman v. Astrue, 596 F. 3d 959 (8th Cir. 2010).   The court should not overturn an ALJ's decision so long as it is in the "zone of choice" even if the court disagrees with the ALJ's conclusion.  Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011).

A.    Evaluation of the Medical Evidence

The ALJ reviewed Depuy's medical records and elicited testimony from medical expert Dr. Steven Goldstein.  Based on the information available, the ALJ determined to

give the most weight to Dr. Goldstein's testimony while giving "little weight" to the opinions of Dr. Erickson. (TR. 19). Depuy asserts the ALJ erred on both counts.

### 1.    Evidence of treating physicians

Depuy asserts the ALJ erred in not affording the opinion of Dr. Erickson sufficient weight in her opinion.[1]

> A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight. See Ghant v. Bowen, 930 F.2d 633, 639 (8th Cir.1991). A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. See Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir.1998). By contrast, "[t]he opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence." Id. Likewise, the testimony of a vocational expert who responds to a hypothetical based on such evidence is not substantial evidence upon which to base a denial of benefits. See Nevland, 204 F.3d at 858.

Singh v. Apfel, 222 F.3d 448, 452 (2000).

If an ALJ discounts a treating physician's opinion, she must express good cause for doing so. Here, the ALJ gave the opinion of Dr. Erickson "little weight," (TR.17), specifically finding:

> Dr. Erickson's treatment records do not reflect the degree of pain reported in [the RFC Dr. Erickson prepared], nor do the clinical findings correlate with such significant functional restrictions. Treatment notes from Dr. Erickson reflect medication management for chronic pain, yet the claimant's pain is frequently noted to be in the low end on the severity scale (typically 2 or 3 out of 10), the claimant generally reports a good overall feeling, and/or is doing well. The medical record also documents decent pain control with medication. Medical records prior to the date last insured

---

[1] Depuy contrasts this with the ALJ's first opinion in which she afforded Dr. Erickson's opinion substantial weight.

> addressed primarily medical clearances in anticipation of moving abroad and routine pregnancy checkups. No functional limitations were identified in any of these records. In addition, records from Dr. Erickson suggest that the claimant was generally stable on her pain medications and did not identify significant functional limitations or deficits. (Exhibits lF, 9F, 14F, and 15F).

(TR. 20).

Dr. Erickson was not Depuy's treating physician during the relevant period. The Eighth Circuit has held that the burden is on the claimant to show the existence of a disability on or before the date that the insurance coverage expires notwithstanding the fact the condition may be latent or degenerative. See Basinger v. Heckler, 725 F.2d 1166, 1168 (8th Cir. 1984). However, the Circuit has held "medical evidence of a claimant's condition subsequent to the expiration of the claimant's insured status is relevant evidence because it may bear upon the severity of the claimant's condition before the expiration of his or her insured status." Basinger, 725 F.2d at 1169 (8th Cir.1984). See also Tilley v. Astrue, 580 F.3d 675, 681 (8th Cir. 2009); Wilson v. Sullivan, 886 F.2d 172, 177 (8th Cir. 1989)(medical reports after the insured status date expired can be "highly relevant" and may "indicate a serious, incessant medical condition"). This is especially true when the treating physicians' notes are not directly in conflict with notes from the relevant time period. Tilley, 580 F.3d at 680.

Thus, the court finds Dr. Erickson's opinions are probative of Depuy's condition to the extent they are not inconsistent with the medical evidence of record. And there is not substantial evidence on the record to completely disregard Dr. Erickson's opinions, as the ALJ did in denying Depuy benefits.

Dr. Erickson noted Depuy's chronic pain and referred Depuy to pain management on January 11, 2011, for the chronic pain due to the automobile accident. (TR. 388). Dr.

Erickson supported Depuy's efforts to receive a handicapped parking permit – indicating her belief Depuy could not walk for any great distance without assistance.  (TR. 403). Dr. Erickson prescribed a TENS unit for Depuy in an attempt to help alleviate her pain which Dr. Erickson described as "chronic and intractable."  (TR. 618).

Dr. Erickson's treatment notes do not fully support the findings of the RFC submitted by Dr. Erickson on Depuy's behalf.  And the ALJ would have been justified in significantly discounting Dr. Erickson's opinions if Dr. Erickson  based her RFC only on her treatment notes alone.  However, Dr. Erickson had access to all of Depuy's medical records dating back to 2003, and much of Depuy's treatment and evaluation was performed at the clinic where Dr. Erickson worked.

Dr. Erickson's opinion is consistent with the notes of Depuy's other treating physicians – which the ALJ mostly ignored.  For instance, Depuy was experiencing back pain at 9 out of 10 as early as 2004.  (TR. 558).  She also reported, and sought treatment for, "chronic and intractable pain" in 2006.  (TR. 519).  In 2006, she continually reported backaches, even when being treated for other ailments. (TR. 505,  507, 514).  She was also taking oxycodone, acetaminophen, and ibuprofen at the time.  (TR. 514).  Depuy attempted to return to work as a receptionist in 2008, (TR. 293), but was unable to do so because of hip and back pain.  Dr. Eric Grajkowski wrote a statement on Depuy's behalf recommending single-level housing due to Depuy's chronic pain.  (TR. 666).  He later opined that due to the nature the injuries she sustained from the motor vehicle accident and her chronic pain, she was "not a good candidate to work outside the home," (TR. 665), further noting Depuy's pain increased with any physical activity.  (TR. 665).

During a physical therapy visit Depuy reported that her pain could vary from 7-8 out of ten while sitting in a car, to 0 out of 10 that same day.  (TR. 441).  In June of 2010,

14

she reported that her hip pain was an 8 out) of 10 if she sits in a chair with her hips flexed at 90 degrees for more than 5 min[utes], and increases the longer she sits." (TR. 413).

At an appointment on October 6, 2009, Depuy reported hip pain of 7 out of 10 on the pain scale during a visit with physician Dr. John Shereck. (TR. 459).

> 32 year-old female presents for evaluation of lateral left hip pain. The patient describes having pain in her left hip intermittently for the past several years, and she has been treated in the past successfully for trochanteric bursitis. She has received steroid injections in the past with good results. This episode has been present for approximately 6 months and is persistent. The patient currently is using tramadol daily. The patient describes that she started having low back, pelvic, and bilateral hip pain following a motor vehicle collision in 1994 that resulted in multiple pelvic fractures and lumbosacrat injury requiring surgeries. The patient currently is using mobic and tramadol as directed. She has used Motrin in the past without success.

(TR. 459).

In November of 2009, at PT evaluation she reported the following:

> L hip pain rated 4/10, notes difficulty with prolonged sit, stand, walk, stairs, lift>20 lb. States pain started April 1994 when she was in MVA, was T-boned. States has not been pain-free since the accident, notes laying down helps, as does ultram, heat temporarily. Job is stay-home mom, states has not been able to work due to inability to tolerate prolonged sit or stand. States has ski machine, tries to walk some every day.[2]

(TR. 458). In June of 2010, she reported hip pain of 8 out of 10 on the pain scale. (TR. 14).

---

[2] Depuy did not say she was able to use the ski machine and stated that she "tried" to walk every day. That is, this statement is not contradictory to the record as a whole.

15

The treatment notes of Dr. Tyrus Soares, with whom Depuy consulted on April 26, 2011 at the direction of Dr. Erickson also, at least partially, supports Dr. Erickson's opinions. Dr. Soares notes Depuy's pain has slowly advanced over time, but is controlled by a "low dose of medication." Depuy reported her pain on the date of her visit as 3 out of 10, but that some days it was 8 out of 10, and it necessitated that she stay in bed two days a week. (TR. 599). Dr. Soares' notes indicated Depuy drives her kids to school and is still "very active" but further noted she must take strong narcotics – Vicodin and Percocet – daily, albeit at a low dose, to manage her pain, (TR. 599), which is "aggravated by walking or standing." (TR. 599). His notes also reflect that her back pain was aggravated by standing and alleviated by sitting, but, in contrast, her leg and pelvic pain is aggravated by sitting and only alleviated by standing. (TR. 599). He acknowledged this created a paradox for her when she attempted to ease her pain. (TR. Dr. Soares further noted that Depuy also requires Ambien to assist her in falling asleep and resting through the night. (TR. 599). Notwithstanding the contradictory nature of these notes, the fact that she was reporting significant pain on a daily basis, had to be in bed two days a week, and required daily doses of narcotics to alleviate pain and medicine to help her sleep are all supportive of Dr. Erikson's opinions.

There is simply not substantial evidence of record to completely discount Dr. Erickson's opinions regarding Depuy's ability to return to work. And perhaps more significantly, the ALJ erred in not discussing the other medical information, including notes from additional treating physicians which provided an additional basis for Dr. Erickson's opinion.[3]

---

[33] Depuy's current physician, Dr. Alan Williamson, essentially adopted the opinions of Dr. Erickson. Thus, the ALJ should have given some weight to Dr. Williamson's opinion as well.

2.   The opinion of Dr. Steven Goldstein

Depuy argues the ALJ should not have given Dr. Goldstein's opinion great weight. The court agrees. "[T]he results of a one-time medical evaluation do not constitute substantial evidence on which the AJL can permissibly base [her] decision . . . ." Cox v. Barnhart, 345 F.3d 606 (8th Cir. 2003). "[O]pinions of doctors who have not examined the claimant ordinarily do not constitute substantial evidence on the record as a whole." Bowman v. Barnhart, 310 F.3d 1080, 1085 (8th Cir. 2002). Likewise, a vocational expert that "relies on the opinions of non-treating, non-examining physicians who reviewed the reports of the treating physician to form an opinion of their own" is not substantial evidence on which the ALJ can base a denial of benefits. See Curran-Kicksey v. Barnhart, 315 F.3d 964, 970 (8th Cir. 2003)(citing Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000)).

Dr. Goldstein based his opinion solely on evidence dated from August 1, 2008 through March 31, 2009. While this is certainly the relevant period, Dr. Goldstein completely ignored the evidence preceding and following that time period—all of which provide context to the limited eight-month time frame he considered. Although Dr. Goldstein acknowledged that Depuy was experiencing chronic pain from the 1994 motor vehicle accident, he suggested it improved for a brief time during the relevant period, (TR. 93), without acknowledging or discussing the fact that Depuy was treated for chronic pain syndrome both before August 1, 2008 and after March 31, 2009. Further, Dr. Goldstein's opinion that Depuy could stand and walk six out of eight hours a day is not supported by the record. The ALJ improperly relied solely upon Dr. Goldstein's opinion in determining the RFC and posing the hypothetical to the VE.

17

B.      Credibility

"It is the ALJ's responsibility to determine a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of [her] limitations."  Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir.1995).  Before the ALJ determines an applicant's RFC, the ALJ must determine the applicant's credibility, because subjective complaints play a role in assessing the RFC. Ellis v. Barnhart, 392 F.3d 988, 995-96 (8th Cir. 2005).  See also, Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001) ("Before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility.").  An ALJ "is not required to discuss every piece of evidence submitted," and the "failure to cite specific evidence [in the decision] does not indicate that such evidence was not considered."  Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998).  "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, we will normally defer to the ALJ's credibility determination."  Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2003).

The ALJ must apply the factors found in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) when assessing the credibility of a claimant's subjective complaints, including: (1) the claimant's daily activities; (2) the duration frequency and intensity of pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions.  Polaski, 739 F.2d at 1322.  An ALJ is not required to discuss each of these factors.  It is sufficient that the ALJ acknowledges and considers the factors prior to discounting the claimant's subjective complaints.  Halverson v. Astrue, 600 F.3d 922, 932 (8th Cir. 2010) (quoting Moore v. Astrue, 572 F.3d 520, 524 (8th Cir. 2009)).

The ALJ determined "[Depuy's] statements concerning the intensity, persistence , and limiting effects of [her] symptoms are not credible to the extent they are inconsistent

18

with the . . . residual functional capacity assessment." In the questionnaire submitted in support of her disability application, Depuy reported that her ability to perform most activities of daily living were seriously inhibited due to her pain, weakness, and poor sleep. (TR. 304-11). Depuy stated that she is able to perform household chores with assistance and that most of her activities such as driving, washing dishes, picking up the house, working in the garden, and driving are limited to less than 20 minutes at a time due to her hip and back pain. (TR. 304). Depuy reported she was limited in performing other activities, such as picking up objects off the floor, shoveling snow, and cleaning that required bending over. (TR. 304-11) In refuting these assertions, the ALJ specifically noted the report of Dr. Soares in which Depuy stated she drove her children to school, gardened, trained dogs and remained very active. (TR. 19). Dr. Soares also indicated that she was on a low dose of medication and doing well. (TR. 19).

The ALJ further noted that while Depuy did receive assistance with indoor and outdoor chores from her husband and children, she "was still able to maintain a household, do the grocery shopping, groom her dog, and attend her children's school ceremony's and concerts." (TR. 20). The ALJ found these described activities to be not limited "to the extent one would expect, given the complaints of disabling symptoms and limitations." (TR. 20).

The ALJ did not provide "good reason" for discrediting the testimony and Depuy's self-described restrictions on daily living. The ALJ relies heavily on the report of Dr. Soares. However, despite Dr. Soares assertion Depuy was doing "well" on low doses of medication, he added a muscle relaxant to her medication regimen, (TR. 600), and did not dispute her reports that she was not helped by previous injections and therapy. And although she stated her pain upon consultation was 3 out of 10, she also stated she had days, as many as twice a week, where the pain was 8 out of 10 and her only relief was to lay in bed. (TR. 599). This report is consistent with Depuy's other

19

reports of pain and the limitations she placed on her daily activities as well as the fact her treating physician described Depuy's pain as waxing and waning since the automobile accident. (TR. 681).

The ALJ also points to the fact Depuy was able to manage the household because she could "do grocery shopping, groom her dog and attend her children's school ceremonies and concerts." (TR. 20). However, both Depuy and her husband stated that she needed help from her children and husband to fulfill these tasks. Further, she also stated there were days she could not complete the tasks "due to back, hip, and nerve pain." (TR. 17). Her husband also reported that Depuy could not properly shower and groom herself as often as she would otherwise. (TR. 314). Thus, to the extent she is able to do some work around the house and do limited driving, her testimony is not supportive of the assertion she can return to full time work. See Reed v. Barnhart, 399 F.3d 917, 923 (8th Cir. 2005); Cf Dunahoo v. Apfel, 241 F.3d 1033, 1038-39 (8th Cir. 2001)(where claimant's ability to perform household chores was considered inconsistent with the claims of disabling, but the ALJ also relied upon the fact the claimant was working part time as a cashier and actively seeking in discrediting her complaints).

Depuy's subjective complaints of pain are supported by the fact she sought various forms of pain management continually since at least 2004 including a regimen that includes daily doses of narcotic pain medication, attempted to return to work in 2008 and had to quit after just a few weeks due to her hip and back pain, has sought single-level housing , and has been issued a handicapped parking sticker. The internally inconsistent report of Dr. Soares and the ALJ's interpretation of Depuy's self-reported ability to do some household chores simply do not constitute good reason to significantly discredit Depuy's reports of pain entirely.

Accordingly,

IT IS ORDERED, that judgment shall be entered by separate document, providing that the Commissioner's decision is reversed and the cause remanded for further proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g).

Dated this 4th day of November, 2014

BY THE COURT:

_s/ Cheryl R. Zwart_
United States Magistrate Judge

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.